**UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT**

| | | |
|---|---|---|
| FRONTIER HOME HEALTH AND | : | |
| HOSPICE, LLC, and | : | |
| FRONTIER WYOMING, LLC, | : | |
|     Plaintiffs, | : | CIVIL CASE NO. |
| | : | 3:23-CV-01215 (JCH) |
| v. | : | |
| | : | |
| EH HEALTH HOME HEALTH OF THE | : | |
| NORTHWEST, | : | |
| EH HEALTH HOSPICE OF THE | : | |
| NORTHWEST, | : | |
| EH HOSPICE OF THE WEST, LLC, | : | |
| CARESOUTH HHA HOLDINGS OF | : | |
| WASHINGTON, LLC, | : | |
| EH HEALTH VENTURES SALIDA, LLC, | : | |
| EH HEALTH VENTURES BOISE, LLC, and | : | |
| EH HEALTH VENTURES BOZEMAN, LLC, | : | |
|     Defendants. | : | MAY 8, 2024 |

**RULING ON PLAINTIFFS' MOTION FOR PREJUDGMENT REMEDY (DOC. NO. 27)**

## I.     INTRODUCTION

Plaintiffs Frontier Home Health and Hospice, LLC and Frontier Wyoming, LLC (collectively, "the Frontier plaintiffs") bring this action, pursuant to this court's diversity jurisdiction, against defendants EH Health Home Health of the Northwest; EH Health Hospice of the Northwest; EH Hospice of the West, LLC; CareSouth HHA Holdings of Washington, LLC; EH Health Ventures Salida, LLC; EH Health Ventures Boise, LLC; and EH Health Ventures Bozeman, LLC (collectively, "the Enhabit defendants").[1]  The

---

[1] The defendants' Opposition Memorandum refers to the defendant entities as "Enhabit."  See Defendants' Opposition to Plaintiffs' Application for Prejudgment Remedy ("Defs.' Opp.") (Doc. No. 36). As such, the court will follow the defendants' lead and refer to the defendant entities as "the Enhabit defendants."

Frontier plaintiffs assert that the Enhabit defendants breached an Asset Purchase Agreement between the parties.

Before this court is the plaintiffs' Motion for Prejudgment Remedy, which seeks an attachment of at least $325,000.  <u>See</u> Plaintiffs' Application for Prejudgment Remedy ("Pls.' Mot.") (Doc No. 27).  The defendants oppose the Motion.  <u>See</u> Defendants' Opposition to Plaintiffs' Application for Prejudgment Remedy ("Defs.' Opp.") (Doc. No. 36).  For the reasons set forth below, the Motion is granted.

## II.    BACKGROUND

### A.    <u>Factual Background</u>[2]

#### 1.    Asset Purchase Agreement

On March 18, 2021, Frontier and Enhabit entered into an Asset Purchase Agreement.  <u>See</u> Asset Purchase Agreement ("Agreement"), Joint Ex. 1 (Doc. No. 27-2).  Pursuant to the Agreement, the Enhabit defendants agreed to purchase from the Frontier plaintiffs certain home health, hospice, and palliative care agencies ("Target Agencies"), as well as membership interests in certain joint ventures.  <u>See</u> <u>id.</u> at 2-6. These Target Agencies were further segmented into two subsets: (1) Acquired Agencies, through which the Frontier plaintiffs directly furnished home health and hospice services; and (2) Joint Venture Agencies, in which they "own[ed] and h[eld] certain equity interests . . . and [were] engaged in providing management and administrative services".  <u>Id.</u> at 2.

---

[2] The following facts are derived from the Joint Exhibits proffered by the parties.  <u>See</u> Exhibit and Witness List (Doc. No. 46).  Unless otherwise noted, the facts are undisputed.  The court discusses certain additional facts in Section IV, <u>see</u> Section IV, <u>infra</u>, at 19-21, based on its factual findings from the prejudgment remedy hearing.

A large portion of the revenue received by these Target Agencies comes from government payors, such as Medicare and Medicaid.  In turn, because of insurance billing protocols and large case volumes, there is often a substantial delay between when services are provided and billed and when reimbursements are received.  See Declaration of Bennett J. Bernblum ("Bernblum Decl."), Pls.' Attach. 1, at ¶ 5 (Doc. No. 27-1); Declaration of Ronald L. Langham, Defs.' Attach. 2, at ¶ 11 (Doc. No. 36-2). Consequently, as part of the Agreement, the parties established a payment reconciliation process.

a)       Section 7: Reconciliation

Section 7 of the Agreement outlines the reconciliation process.  As a threshold matter, the Agreement provides for a "Reconciliation Cycle", which is defined as "each of" three distinct periods of time relative to the "Closing Date", i.e., the date of the closing of a transaction.  See Agreement at A-15.  Specifically, the Agreement delineates these periods as follows: "(i) the period beginning on the Closing Date and ending 60 calendar days after the Closing Date; (ii) the period beginning on the 60th calendar day after the Closing Date and ending 90 calendar days after the Closing Date; and (iii) the period beginning on the 90th calendar day after the Closing Date and ending 240 calendar days after the Closing Date."  Id.  Pursuant to Section 7, "[d]uring each Reconciliation Cycle," the Frontier plaintiffs would "bill and collect" the "Pre-Closing Receivables[3] and Cross-Over Receivables"[4] and then "forward, without

---

[3] The Agreement defines "Pre-Closing Receivables" as "accounts receivable arising from or generated from" services "before the Closing Date, whether or not reflected in [the Frontier plaintiffs'] balance sheet as of the Closing Date and whether billed or unbilled on the Closing Date."  Id. at A-14.

[4] The Agreement defines "Cross-Over Receivables as "accounts receivable relating to Periods of Care that . . . started before the Closing Date and end on or after the Closing Date."  Id. at A-5.

deduction or set-off, all collections on Pre-Closing Receivables and Cross-Over Receivables to [the Enhabit defendants] each Business Day of the Reconciliation Cycle[.]" See id. at 8. Then, "[o]n the tenth Business Day after the date that is one month following the Closing Date, [the Enhabit defendants] [were required to] pay to [the Frontier plaintiffs] an amount equal to ninety percent (90%) of [the Enhabit defendants'] good faith estimate of the Pre-Closing Receivables collected and Seller Periodic Payments collected,[5] in each case during the one-month period immediately following the Closing Date." Id. at 9. Section 7(c) further provides that, "[o]n the first Business Day after the end of each Reconciliation Cycle, [the Enhabit defendants] [must] perform a reconciliation of the collections on the Pre-Closing Receivables and Cross-Over Receivables and any Payment Adjustments during such Reconciliation Cycle", pursuant to the allocation methodology detailed in Section 7. See id. at 9-10.

Section 7(d) of the Agreement details the allocation methodology for payment adjustments. See id. at 10. The Section provides, in part:

> During each Reconciliation Cycle, whether collections on the Pre-Closing Receivables or other accounts receivable are received by Buyers [i.e., the Enhabit defendants] or Sellers [i.e., the Frontier plaintiffs], (i) Sellers will be allocated and entitled to collections on the Pre-Closing Receivables and Seller Periodic Payments, in each case, other than Outlier Reconciliation Payments and net of all Payment Adjustments (regardless whether the Payment Adjustments, without duplication, are attributable to accounts receivable collected during such Reconciliation Cycle or any prior period of Sellers), in each case, without any claim from Buyers, and (ii) Buyers will be allocated and entitled to collections on Buyer Receivables, Buyer Periodic Payments, and Outlier Payments, in each case, without any claim from Sellers.

Id. (emphasis added).

Section 7(d) further provides:

---

[5] "Seller Periodic Payments" are defined as "the amount collected on all Seller Cross-Over Receivables." Id. at A-16.

For the avoidance of doubt, any Payment Adjustments made during the Reconciliation Cycle with respect to collections on the Pre-Closing Receivables or Seller Periodic Payments may be allocated against Sellers [i.e., the Frontier plaintiffs] as part of the reconciliation process under this Section 7.  Further, in addition to any other Payment Adjustments, the Parties agree that if any documentation (including, without limitation, documentation related to face-to-face encounters, start of care, and certification and recertification of eligibility for home health services or hospice and palliative care services) required by Applicable Laws for Medicare-reimbursed home health services or hospice or palliative care services relating to accounts receivable allocated to Sellers in accordance with this Section 7, is not timely and properly completed by Sellers in accordance with Applicable Laws (in Buyers' [i.e., the Enhabit defendants'] reasonable discretion), including, without limitation, submitting requests for anticipated payment within five calendar days of the beginning of a Period of Care, then any Payment Adjustments resulting therefrom will be allocated entirely against Sellers in favor of Buyers as part of the reconciliation process under this Section 7, but without prejudice to Sellers' rights to appeal such Payment Adjustments, subject to the provisions of Section 13(g).

Id.

> b)     Section 16: Indemnification

Notably, the Agreement contains a separate provision regarding the parties' indemnification obligations.  Section 16(b)(i) provides that Frontier must indemnify Enhabit for any "inaccuracy in" or "breach of any representation or warranty."  Id. at 42.  Conversely, Section 16(b)(ii) provides that Enhabit must indemnify Frontier for "any breach, non-fulfillment, or failure of any Buyer to timely pay, perform, or discharge, in any case, any of the covenants, obligations or other agreements of such Buyer."  Id. at 43.

Section 16(c), in turn, limits the Frontier plaintiffs' indemnity obligations in certain circumstances.  Specifically, it provides that, where there is an inaccuracy or breach,

but said breach is not a breach of a "Fundamental Representation",[6] the Frontier

plaintiffs are only required to pay 50% of the resultant damages, provided that the

amount of damages remains under the threshold amount of $2,300,000.  See id. at 43,

A-17.  The Section further specifies that "[the Frontier plaintiffs] will be responsible for

and will pay for all" damages "in excess of the threshold".  Id. at 43.

Section 16(i) also provides that Enhabit may "set-off any amounts to which they

are entitled under this Section 16 against any payments or other amounts due to"

Frontier, "provided, that, the set-off right set forth in this Section 16(i)(ii) will not apply to

any reconciliation payments due pursuant to Section 7."  Id. at 46-47.

Finally, Section 16(k) establishes that the "sole and exclusive remedy with

respect to any and all Damages for any breach of any representation, warranty,

covenant, agreement, or obligation set forth [in the Agreement] or in connection with or

otherwise arising out of the Transaction . . . shall be pursuant to the indemnification

provisions set forth in this Section 16."  Id. at 47.

2.      Enhabit Defendants' Payment Adjustments

On July 15, 2021, Enhabit sent Frontier a letter stating that they would "remit to

[Frontier], by wire transfer of immediately available funds, the amount of

$1,646,567.73," but would withhold, pursuant to Section 7, $681,130.12 due to

Frontiers' "failure to comply" with certain Medicare regulations, "including by conducting

certain face-to-face encounters for recertification of hospice and health services by

audio only as opposed to audio and video."  See July 15, 2021 Letter from Enhabit to

_____

[6] The parties appear to agree that the Enhabit defendants have not claimed any breach of a
"Fundamental Representation."   See Pls.' Mot. at 6; Defs.' Opp. at 8.

6

Frontier, at 1, Joint Ex. 2 (Doc. No. 36-3).  Importantly, these withheld sums were billed and collected by Frontier before the applicable Closing Date, and therefore did not constitute "Pre-Closing Receivables" or "Seller Periodic Payments" under Section 7.  In response, on July 19, 2021, Frontier sent Enhabit a Claim Notice asserting an indemnity claim for the $681,130.12, on the ground that it was "improperly set-off" under the Section 7 reconciliation process, when it should have been asserted as an indemnity claim under Section 16.  See July 19, 2021 Claim Notice from Frontier to Enhabit, Joint Ex. 3 (Doc. No. 27-4).  Enhabit replied to the Claim Notice on July 28, 2021, and informed Frontier that they would remit $125,172.43 of the amount withheld, but would otherwise retain the remaining $555,957.69, asserting that this amount was properly withheld under Section 7.  See July 28, 2021 Letter from Enhabit to Frontier, Joint Ex. 4 (Doc. No. 36-7).

After July 2021, Enhabit asserted multiple indemnity claims, pursuant to Section 16, for billing errors made by Joint Venture Agencies.  See October 12, 2021 Indemnity Claim from Enhabit to Frontier ("October 12, 2021 Indemnity Claim"), Joint Ex. 5 (Doc. No. 27-6); December 14, 2021 Indemnity Claim from Enhabit to Frontier, Joint Ex. 6 (Doc. No. 36-9); June 1, 2022 Indemnity Claim from Enhabit to Frontier, Joint Ex. 7 (Doc. No. 27-8).  Pursuant to Section 16, Enhabit withheld 50% of the amount of these ostensible billing errors.  See id.  In its October 12, 2021 Notice, Enhabit sought to distinguish these Section 16 claims from the July 2021 withholding, asserting that:

> [T]he Damages described in this letter are different from the Payment Adjustments that were included in Buyers' [i.e., the Enhabit defendants'] prior offset from the Initial Receivables Payment in Buyer's letter dated July 15, 2021 (the "Offset").  In particular, the $120,731.02 amount described in Claim #1 above was initially included in the Offset, but was subsequently removed and remitted to Sellers [i.e., the Frontier plaintiffs] as set forth in our letter dated July

28, 2021 upon Buyers' confirmation that such amount related to a Joint Venture
Agency.  In addition, the Damages described in Claim #2 above relate entirely to
post-Closing dates of service, whereas the Payment Adjustments included in the
Offset related to pre-Closing dates of service only.

October 12, 2021 Indemnity Claim at 4.

> 3.      Arbitration Proceeding

To recover the withheld funds, Frontier submitted the matter for arbitration,

pursuant to Section 7(h) of the Agreement,[7] to the Dallas office of the American

Arbitration Association ("AAA").  See November 21, 2022 Arbitration Letter, Joint Ex. 8

(Doc. No. 27-9).  Frontier sought arbitration as to the indemnity claim for the

$555,957.69, withheld by Enhabit, and further sought arbitration as to the additional

amounts that Enhabit set-off pursuant to Section 16.  See Frontier Claimants' Demand

for Arbitration, Joint Ex. 13 (Doc. No. 36-16).  Enhabit then filed a Motion to Dismiss on

the ground that the AAA lacked jurisdiction to hear the dispute, see Respondents'

Application for Emergency Measures of Protection and Motion to Dismiss, Joint Ex. 14

(Doc. No. 27-11), which Frontier opposed, see Claimants' Opposition to Respondents'

Motion to Dismiss, Joint Ex. 15 (Doc. No. 27-12).  In their Reply to the Motion to

Dismiss, the Enhabit defendants further asserted that, because the Frontier plaintiffs'

claim for the $555,957.69 was brought pursuant to Section 16, the claim must be

litigated in court, pursuant to the terms of Section 16, in lieu of arbitration.  See

Respondents' Reply in Support of Motion to Dismiss ("Respondents' Reply"), Joint Ex.

16, at 12-13 (Doc. No. 27-13).

---

[7] Section 7(h) provides that "any controversies or claims arising under or relating to the
reconciliation of accounts receivable under this Section 7 will be resolved by arbitration under this Section
7(h)."  Agreement at 11.

The Emergency Arbitrator subsequently issued an Order dismissing the Frontier plaintiffs' arbitration claim on the ground that "Claimant[s'] claim is for indemnification under Section 16 of the APA and has made no claim under Section 7, reconciliation of accounts, therefore, in accordance with the terms of the APA as agreed to by the parties, the AAA does not have jurisdiction over this matter." <u>See</u> Emergency Arbitrator's Order on Motion to Dismiss ("Arbitrator's Order"), Joint Ex. 17, at 2-3 (Doc. No. 27-14).

      B.    <u>Procedural Background</u>

On August 16, 2023, the Frontier plaintiffs filed suit against the Enhabit defendants in the Connecticut Superior Court, alleging breach of contract. <u>See</u> Compl. (Doc. No. 1-1). The defendants removed the case to this court on September 15, 2023. <u>See</u> Notice of Removal (Doc. No. 1). On November 10, 2023, the Frontier plaintiffs filed a Motion for Prejudgment Remedy, <u>see</u> Pls.' Mot, which the Enhabit defendants oppose, <u>see</u> Defs.' Opp. On January 26, 2024, this court held a hearing on the Frontier plaintiffs' Motion. <u>See</u> Minute Entry (Doc. No. 47); January 26, 2024 Hearing Transcript ("Hr'g Tr.") (Doc. No. 56).[8]

## III.   LEGAL STANDARD

Under Rule 64 of the Federal Rules of Civil Procedure, a plaintiff may utilize the state prejudgment remedies available to secure a judgment that might ultimately be rendered in an action. <u>See</u> <u>Granny Goose Foods, Inc. v. Brotherhood of Teamsters &</u>

---

[8] In response to the Frontier plaintiffs' Motion—which included, <u>inter alia</u>, a Declaration from Bennett J. Bernblum, "a manager and member of Frontier", <u>see</u> Bernblum Decl. ¶ 1—Enhabit moved to strike the Bernblum Declaration. <u>See</u> Defendants' Motion to Strike Bernblum Declaration (Doc. No. 37). The court denied the Motion to Strike. <u>See</u> Hr'g Tr. at 4:17-5:12.

Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 436 n.10 (1974);

Roberts v. TriPlanet Partners, LLC, 950 F. Supp. 2d 418, 420 (D. Conn. 2013).  When

applying the legal standard for determining whether a PJR should attach, federal courts

sitting in diversity jurisdiction apply the procedural law of the state in which the court

sits, regardless of whether the action is brought pursuant to a contract with a choice-of-

law provision.  See Wachovia Bank, N.A. v. Cummings, No. 309CV957SRU, 2010 WL

466160, at *4-*8 (D. Conn. Feb. 8, 2010).

Connecticut law allows a court to grant a motion for prejudgment remedy upon a

showing by the movant that "there is probable cause to sustain the validity of the

plaintiff's claim."  Conn. Gen. Stat. § 52–278d(a).  Connecticut courts commonly

describe the legal notion of probable cause as "a bona fide belief in the existence of the

facts essential under the law for the action and such as would warrant a man of ordinary

caution, prudence and judgment, under the circumstances, in entertaining it."  Orsini v.

Tarro, 80 Conn. App. 268, 272 (2003) (quotations and citations omitted).  Probable

cause is properly understood to be "a flexible common sense standard" that is less

demanding than standards which require findings to be made based on a

preponderance of the evidence or even a likelihood of success.  See id.  A plaintiff need

only establish "probable cause that a judgment will issue in an amount equal to, or

greater than, the amount of the prejudgment remedy sought."  TES Franchising LLC v.

Feldman, 286 Conn. 132, 147 (2008).

In addition to a finding of probable cause after "taking into account any defenses,

counterclaims or set-offs," section 52-278d(a) also requires a court to determine:

(2) whether payment of any judgment may be rendered is adequately
secured by insurance, (3) whether the property sought to be subjected to

the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy.

Conn. Gen. Stat. § 52–278d(a).

## IV.    DISCUSSION

The Frontier plaintiffs seek a prejudgment attachment of at least $325,000 on the ground that there is probable cause that they will prevail on their breach of contract claim and that they will be awarded the requested monetary amount, or an amount greater.[9]  See Pls.' Mot. at 2.  The Frontier plaintiffs contend that, based on the language of the Agreement as interpreted under Delaware law,[10] the $555,957.69 withheld by Enhabit was improperly withheld under Section 7's reconciliation process, rather than Section 16's indemnification process, which would have permitted Frontier to retain 50% of the $555,957.69.[11]  See id. at 5.  The Frontier plaintiffs also assert that the Enhabit defendants are judicially and collaterally estopped from arguing that Section 7—rather than Section 16—applies to the withheld funds, based on arguments made by the Enhabit defendants in the prior arbitration proceeding.  See Pls.' Mot. at 13-15.  The

---

[9] At the hearing, the defendants confirmed to the court that plaintiffs have adequately complied with the procedural requirements for pursuing a prejudgment remedy, pursuant to Connecticut law, in federal court.  See Hr'g Tr. at 5:13-5:19.

[10] Both parties agree that, although Connecticut law governs the prejudgment remedy standard, Delaware law governs the Frontier plaintiffs' underlying, substantive breach of contract claim, pursuant to the Agreement's choice-of-law provision.  See Hr'g Tr. at 5:20-6:17 (agreeing that the underlying breach of contract claim is governed by Delaware law); accord Agreement at 49 ("This Agreement will be governed by and construed and enforced in accordance with the substantive laws of the State of Delaware, without giving effect to the principles of conflict of laws.").

[11] As discussed below, the Frontier plaintiffs seek, as their prejudgment remedy, 50% of the withheld $555,957.69, plus prejudgment interest.  See Section IV.E, infra.

court first addresses the Frontier plaintiffs' argument regarding estoppel, before addressing their substantive arguments as to the Agreement.

      A.    <u>Estoppel</u>

The Frontier plaintiffs assert that the Enhabit defendants are judicially and collaterally estopped from arguing to this court that the $555,957.69 was properly withheld under Section 7 because the defendants previously "argued before the AAA that all the claims at issue in this litigation are Section 16 indemnification claims and that the arbitration proceeding should be dismissed," which the Emergency Arbitrator then adopted in its Ruling dismissing the arbitration action.  <u>See</u> Pls.' Mot. at 14-15.

The court respectfully disagrees.  Judicial estoppel is an equitable rule "designed to prevent a party who plays fast and loose with the courts from gaining unfair advantage through the deliberate adoption of inconsistent positions in successive [proceedings]."  <u>Wight v. BankAmerica Corp.</u>, 219 F.3d 79, 89 (2d Cir. 2000); <u>accord</u> <u>Motorola Inc. v. Amkor Tech., Inc.</u>, 958 A.2d 852, 859 (Del. 2008) ("Judicial estoppel acts to preclude a party from asserting a position inconsistent with a position previously taken in the same or earlier legal proceeding.").  After reviewing the parties' moving papers in the prior arbitration proceeding, the court cannot conclude that the defendants took a prior "inconsistent" position, such that judicial estoppel is warranted.

In moving to dismiss the Frontier plaintiffs' arbitration claim, the Enhabit defendants argued, <u>inter alia</u>, that the judicial system, rather than the AAA, was the proper avenue for the parties' dispute because (1) the Frontier plaintiffs were seeking to recover the $555,957.69 via a Section 16 indemnity claim and (2) disputes brought pursuant to Section 16, per the Agreement, must be resolved in the courts.  <u>See</u>

Respondents' Reply at 12-13.  At no point in their moving papers did the defendants concede or abandon their original position that the $555,957.69 was properly withheld under Section 7.  Indeed, the Enhabit defendants noted, in their moving papers, that they made the adjustment "to the 90% of the Pre-Closing Receivables owed under Section 7".  Id. at 6 (emphasis added).  The court does not consider the defendants' position during the arbitration proceeding to be clearly inconsistent with their current position.  Accordingly, the court does not find that the Enhabit defendants are judicially estopped from arguing that the $555,957.69 was properly withheld under Section 7.

In turn, the court finds, for the same reason, that the Enhabit defendants are not collaterally estopped from advancing the argument that the $555,957.69 was properly withheld under Section 7.  Collateral estoppel prohibits the re-litigation of identical issues in successive proceedings.  See Parklane Hosiery Co., Inc. v. Shore, 439 U.S. 322, 326 (1979); accord Columbia Cas. Co. v. Playtex FP, Inc., 584 A.2d 1214, 1216 (Del. 1991) (same).  The Emergency Arbitrator dismissed the Frontier plaintiffs' arbitration action for lack of jurisdiction on the ground that the plaintiffs were seeking to recover the $555,957.69 via an indemnity claim pursuant to Section 16.  See Arbitrator's Order at 2-3.  The Emergency Arbitrator did not address the issue of whether the defendants properly withheld the $555,957.69 under Section 7.  As such, the court cannot conclude that collateral estoppel applies to the case at bar.

B.    Contract Interpretation

Having determined that estoppel does not apply, the court must now assess the merits of the Frontier plaintiffs' breach of contract claim.  In Delaware, the elements of a contract are existence of a contract, breach, and damages.  See Connelly v. State Farm

Mut. Auto. Ins. Co., 135 A.3d 1271, 1279 n.28 (Del. 2016).  Here, the crux of the parties'
dispute is whether the Enhabit defendants violated the terms of the Agreement by
withholding the $555,957.69 via Section 7's reconciliation process.  Accordingly, to
determine whether probable cause exists to attach a prejudgment remedy, the court
must assess the language of the Agreement.

      Under Delaware law, contract interpretation is a question of law, and a "contract's
construction should be that which would be understood by an objective, reasonable
third party."  Osborn v. Kemp, 991 A.2d 1153, 1159 (Del. 2010) (quoting NBC Universal
v. Paxson Commc'ns, No. Civ. A. 650-N, 2005 WL 1038997, at *5 (Del. Ch. Apr. 29,
2005)).  Courts should read the contract as a whole, giving effect to each provision.  Id.
Where a contract is "clear and unambiguous, [the court must] give effect to the plain-
meaning of the contract's terms and provisions."  Id. at 1159-60.  A contract is
ambiguous if a court "may reasonably ascribe multiple and different interpretations" to it.
Id. at 1160.  "The determination of ambiguity lies within the sole province of the court."
Id.

      The plaintiffs contend that the language of Sections 7 and 16 unambiguously
prohibited the defendants from setting off the $555,957.69 under Section 7's
reconciliation process; further, they contend that Section 16's indemnification process,
which would have only required the plaintiffs to absorb 50% of the damages, was the
only proper avenue for withholding the funds.  See Pls.' Mot. at 5-9.  Specifically, the
Frontier plaintiffs point to Section 16(b)(i), which requires the Frontier plaintiffs to
indemnify the Enhabit defendants for "any inaccuracy in or breach of any representation
or warranty", see Agreement at 42, and Section 16(i)(ii), which provides that the

14

defendants "may set-off any amount to which they are entitled under this Section 16 against any payments or other amounts due to Sellers [i.e., the Frontier plaintiffs] or Owners; provided, that, the set-off right set forth in this Section 16(i)(ii) will not apply to any reconciliation payments due pursuant to Section 7", id. at 46-47.  The Frontier plaintiffs also point to Section 16(k), which states that Section 16 provides the "sole and exclusive remedy with respect to any and all Damages for any breach of any representation, warranty, covenant, agreement, or obligation" in the Agreement.  Id. at 47.  In turn, the plaintiffs argue that the language of Section 7 reaffirms that the Section 7 reconciliation process is narrow and only applies to collections of Pre-Closing Receivables or Seller Period Payments, rather than funds that the plaintiffs received before closing, e.g., the $555,957.69 at issue in this case.  Specifically, they cite the following sentence in Section 7(d):

> For the avoidance of doubt, any Payment Adjustments made during the Reconciliation Cycle with respect to collections on the Pre-Closing Receivables or Seller Periodic Payments may be allocated against Sellers as part of the reconciliation process under this Section 7.

Id. at 10.  This sentence, the Frontier plaintiffs contend, expressly limits the set-off right to Pre-Closing Receivables or Seller Periodic Payments, neither of which encompass the $555,957.69.  See Pls.' Mot. at 8.

By contrast, the Enhabit defendants advance a broader interpretation of Section 7.  The defendants point to the first sentence of Section 7(d), which provides that:

> During each Reconciliation Cycle, whether collections on the Pre-Closing Receivables or other accounts receivable are received by Buyers [i.e., the Enhabit defendants] or Sellers [i.e., the Frontier plaintiffs], (i) Sellers will be allocated and entitled to collections on the Pre-Closing Receivables and Seller Periodic Payments, in each case, other than Outlier Reconciliation Payments and net of all Payment Adjustments (regardless whether the Payment Adjustments, without duplication, are attributable to accounts receivable collected during such Reconciliation Cycle or any prior period of Sellers) . . . .

15

Agreement at 10 (emphasis added).  The Enhabit defendants assert that the phrase "net of all Payment Adjustments" and the accompanying parenthetical—which references "accounts receivable collected during such Reconciliation Cycle" as well as "any prior period of Sellers"—make clear that Payment Adjustments under Section 7's reconciliation process are not, as the Frontier plaintiffs contend, solely limited to account receivables outstanding on the Closing Date and collected during the Reconciliation Cycle.  The defendants also note that the term "Payment Adjustments" is broadly defined in the Agreement, encompassing "amounts paid to Sellers for home health services or hospice or palliative care services furnished before the Closing Date" and "Recapture Amounts", i.e., "all amounts . . . relating to periods before the Closing Date" that "Buyers determine is owing by any Target Agency to any Governmental Authority or Payor Program."[12]  Id. at A-13, A-14.

The Enhabit defendants also dispute the Frontier plaintiffs' contention that other portions of Sections 7 and 16 negate the defendants' broader interpretation of Section 7.  Specifically, the defendants contend that the "avoidance of doubt" language is not meant to limit the Section to collections on Pre-Closing Receivables or Seller Periodic Payments, but rather, "simply reinforces that in the event one of the Payment Adjustments relates to a Pre-Closing Receivable, it may be allocated against the Sellers under Section 7."  Defs.' Opp. at 20.  The defendants also assert that the language in

---

[12] The Enhabit defendants also assert, in response to the Frontier plaintiffs' contention that the term "Payment Adjustments" is necessarily limited by the surrounding language in Section 7, that the term "does not appear anywhere else in the body of the [Agreement] but in Section 7," and that "there is no explanation for including language limiting a definition in the only section where that definition is used." Defs.' Opp. at 21.

Section 16(i)(ii) is, in fact, reconcilable with their broader interpretation of Section 7, because Section 16(i)(ii) "simply limits what [the Enhabit defendants] can consider a 'Payment Adjustment' under the reconciliation process", and the $555,957.69 does not fall outside these limits. Id. at 25 (citing examples of such limits).

      Having reviewed the contract language at issue, as well as the parties' arguments, the court concludes that the Agreement is ambiguous as to the limits of Section 7's reconciliation process. As the court noted at the hearing, the meaning of the phrase "any prior period of Sellers"—on which the defendants' interpretation heavily relies—is extremely unclear. Nor is it clarified in any way by its context. To be sure, the language "attributable to accounts receivable collected during such Reconciliation Cycle or any prior period of Sellers" could suggest that "any prior period of Sellers" is broad enough to include periods, prior to the first of the three Reconciliation Cycles, in which the Frontier plaintiffs collected accounts receivable. That is not, however, the only viable or reasonable interpretation of this language. The plaintiffs have proffered alternative interpretations of the phrase "any prior period of Sellers" that, based on the vague phrase and the surrounding contract language, are similarly plausible. See Plaintiffs' Reply in Support of Application for Prejudgment Remedy, at 6 (Doc. No. 39) (arguing that the phrase may refer to "an earlier reconciliation cycle or cycles, to the extent the applicable reconciliation cycle is not the first" or, alternatively, to instances in which "the government reduced a Pre-Closing Receivable due to a prior event"). The surrounding contract language, in this court's view, does not provide guidance sufficient for the court to ascribe a single, correct meaning to the phrase "any prior period of Sellers." Simply put, the phrase is ambiguous.

Even setting aside the ambiguous "any prior period of Sellers" phrase, the language of the Agreement does not clearly delineate the boundaries of Section 7 and Section 16.  The meaning of the term "Payment Adjustments", as used in Section 7, is unclear.  Although the defendants are correct that the Agreement broadly defines the term, and that the term solely appears in Section 7, the "avoidance of doubt" language in Section 7 could plausibly be interpreted to limit such Payment Adjustments to "collections on the Pre-Closing Receivables or Seller Periodic Payments."  Id. at 10. However, the clause is somewhat vague on this point: it does not explicitly state that the reconciliation process exclusively encompasses Payment Adjustments relating to collections of Pre-Closing Receivables or Seller Periodic Payments.  Thus, the court finds the defendants' interpretation of this clause plausible, such that the court cannot say that the phrase unambiguously limits Section 7's set-off right to Pre-Closing Receivables or Seller Periodic Payments, as the Frontier plaintiffs contend.  And, as discussed above, the phrase "any prior period of Sellers" is essentially incomprehensible, and therefore provides little clarity on this issue.[13]

Moreover, while the Frontier plaintiffs are correct that Section 16(i)(ii) and Section 16(k) can plausibly be read to limit Section 7's reconciliation process to Payment Adjustments relating to collections of Pre-Closing Receivables or Seller Periodic Payments, neither subsection is clear or explicit on this point.  Further, the Enhabit

---

[13] Contrary to both parties' assertions, the court finds that the remaining language in Section 7(d)—namely, the language regarding "any documentation"—is similarly ambiguous as to whether Section 7's reconciliation process can encompass more than Pre-Closing Receivables and Seller Periodic Payments.  This portion of Section 7(d) reaffirms that adjustments regarding documentation issues, including "documentation related to face-to-face encounters," may be allocated entirely against Frontier, provided that such documentation pertains to services "relating to accounts receivable allocated to Sellers in accordance with this Section 7".  Id. at 10.  As discussed above, it is not clear, from the Agreement's language, what constitutes "accounts receivable allocated to Sellers in accordance with this Section 7".

defendants advance their own interpretation that plausibly aligns with the contract language.  See Defs.' Opp at 25 (interpreting the language of Section 16(i)(ii) as establishing the outer limits "on what set-offs must occur within the indemnity process", and citing, as an example, that the Enhabit defendants "cannot set-off any amounts paid related to a third-party malpractice claim under the Section 7 reconciliation process").

In sum, the contract language does not make clear whether the defendants' $555,957.69 set-off under Section 7 was, in fact, permissible.  Thus, because an objective third party "may reasonably ascribe multiple and different interpretations" to the Agreement, see Osborn, 991 A.2d at 1159, the court concludes, for purposes of this Ruling, that the Agreement is ambiguous.

C.     Findings of Fact and Extrinsic Evidence

Under Delaware law, "when there is uncertainty in the meaning and application of contract language, the reviewing court must consider the [extrinsic] evidence offered in order to arrive at a proper interpretation of contractual terms."[14]  Eagle Inds., Inc. v. DeVibiss Health Care, Inc., 702 A.2d 1228, 1233 (Del. 1997).  Here, the Frontier plaintiffs offer the testimony of Bennett J. Bernblum ("Bernblum"), a manager and member of Frontier.  See Bernblum Decl. ¶ 2.  In his Declaration and at the hearing, Bernblum testified, based on his participation in contract negotiations, that the parties initially planned to purchase representations and warranties insurance to account for potential liability for repayment of Medicare and Medicaid claims previously received by

---

[14] Under Connecticut law, which governs the prejudgment remedy standard in the case at bar, a court may rely on extrinsic evidence to establish probable cause that a plaintiff will prevail on a breach of contract claim.  See Johnson v. Vita Built, LLC, 217 Conn. App. 71, 90 (2022) (noting that extrinsic evidence may be sufficient to establish probable cause for a prejudgment remedy on a breach of contract claim).

the Frontier plaintiffs.  See id. at ¶ 12; Hr'g Tr. at 12:12-17:1.  Bernblum has further

attested that, when this insurance did not become part of the parties' deal, Frontier

insisted on increasing the monetary threshold in Section 16 for the 50/50 split on

indemnification claims to mitigate the Frontier plaintiffs' increased exposure.  See

Bernblum Decl. ¶ 12; Hr'g Tr. at 18:22-21:10.  In addition, Bernblum testified regarding

a February 22, 2021 meeting between Frontier and Enhabit representatives—for which

he has also provided his contemporaneous notes—wherein, he attests, Frontier and

Enhabit purportedly agreed that Payment Adjustments under Section 7 would solely

apply to accounts receivable existing on the Closing Date, i.e., amounts not yet received

prior to the Closing Date.  See Hr'g Tr. at 34:5-38:17; February 22, 2021 Notes of

Bennett J. Bernblum, Pls.' Ex. 20.

     The court finds that Bernblum was credible and forthright in his testimony during

the hearing, and it therefore credits his testimony and concludes, for the purposes of

this Ruling, that his statements regarding the parties' negotiations are factually

accurate.[15]

---

[15] As noted above, at the hearing, the court denied the defendants' Motion to Strike Bernblum's
Declaration.  See Hr'g Tr. at 4:17-5:12.  The court reiterates its conclusion, in this Ruling, that it may
permissibly consider Bernblum's testimony regarding the parties' contract negotiations and the Frontier
plaintiffs' intent.  The testimony and accompanying evidence are not impermissible under the parol
evidence rule because, as this court has already found, the Agreement is ambiguous.  Nor does the
testimony impermissibly instruct the court on how to interpret the Agreement, as the defendants contend;
rather, Bernblum's testimony provides the court with additional information to help resolve the uncertainty
as to the scope and meaning of the provisions in question.  It is also apparent, to this court, that
Bernblum, as a participant in the negotiation of the Agreement, has sufficient personal knowledge to
testify as to these negotiations.  See, e.g., Hr'g Tr. at 18:5-18:16.

     In addition, the court also notes that it disagrees with the defendants' argument that the
Agreement's integration clause prohibits consideration of external evidence, such as Bernblum's
testimony.  The integration clause provides that "[t]his Agreement, together with the schedules and
exhibits to this Agreement, constitute the entire agreement of the Parties and supersede all prior
agreements and understandings among them relating to the subject matter hereof."  See Agreement at
51.  However, as the Frontier plaintiffs correctly note, extrinsic evidence may be considered when a
contract is ambiguous, even if the contract contains an integration or merger clause.  See Eagle Inds.,

Given that the Frontier plaintiffs pushed, during contract negotiations, to increase the cap for indemnification claims, and given that this push was to account for potential liability for repayment of Medicare and Medicaid funds previously received, it is logical that the parties intended Section 16 to be the sole and exclusive avenue for the Enhabit defendants to recoup these funds.  The court thus agrees with the plaintiffs that, with this factual basis, the plaintiffs' interpretation of Section 7 and Section 16 is the more reasonable one, i.e., that Section 7's reconciliation process only permits adjustments to collections of Pre-Closing Receivables or Seller Periodic Payments, and that any other adjustments must be made pursuant to Section 16's indemnification process.  This conclusion is further bolstered by Bernblum's testimony and contemporaneous notes regarding the February 22, 2021 meeting between Frontier and Enhabit officials.  The court therefore concludes, for purposes of this Ruling, that the extrinsic evidence supports Frontiers' interpretation of the Agreement, and that there is probable cause to believe a jury would find that the defendants breached the Agreement.

     D.    Defenses and Counterclaim

Before finding probable cause, however, the court accounts for Enhabits' defenses.  See Conn. Gen. Stat. § 52–278d(a).  Notably, although the Enhabit defendants have proffered four defenses in their Answer, see Answer (Doc. No. 19), they did not raise these defenses in their Opposition or at the hearing, see Defs.' Opp.; Hr'g Tr.  They argue only that the Agreement unambiguously permitted the $555,957.69 adjustment.  Nonetheless, even after considering the defenses enumerated in Enhabits'

_____

Inc. v. DeVilbiss Health Care, Inc., 702 A.2d 1228, 1233 n.10 (Del. 1997) (noting that an integration provision does not necessarily bar consideration of extrinsic evidence in interpreting an ambiguous, negotiated bilateral contract).

Answer, the court cannot conclude that any of these defenses eliminate probable cause

that the Frontier plaintiffs will prevail on their breach of contract claim.  The First

Defense—that plaintiffs' claims are barred, in whole or in part, due to their own actions

or inactions—is vague, and the court cannot glean, from the existing record, why

Frontiers' actions or inactions preclude recovery in this case.  The Second Defense,

which alleges that the plaintiffs first breached the Agreement and are therefore not

entitled to recovery, is similarly unpersuasive to this court, at least for purposes of this

Ruling.  The defense does not specify Frontiers' alleged breach.  Assuming the breach

was Frontiers' failure to comply with Medicare regulations, Section 16's indemnification

process appears to provide a mechanism to account for this type of "inaccuracy" or

"breach of any representation or warranty".  As discussed above, the Frontier plaintiffs

have credibly argued that the Enhabit defendants withheld excess funds in violation of

this Section, thereby warranting recovery for breach of contract.  The Third Defense—

that any recovery by plaintiffs is "subject to set-off based on monies owed to

[d]efendants"—also does not eliminate probable cause, given that Frontiers' requested

prejudgment attachment, which constitutes only 50% of the allegedly improperly

withheld funds plus prejudgment interest, already appears to account for this set-off.[16]

Finally, the Fourth Defense asserts that Frontiers' Complaint fails to state a claim upon

which relief may be granted.  This defense is technically not a proper affirmative

defense, see Walker v. Schult, 45 F.4th 598, 615 (2d Cir. 2022), and, in any event, the

---

[16] The court cannot locate, in the available record, any other potential set-offs that would preclude a finding that there is probable cause that plaintiffs will prevail on their claim in an amount equal to or greater than $325,000.  See Section IV.E, infra (determining that there is probable cause that plaintiffs will be awarded at least $325,000).

court disagrees with the assertion that plaintiffs' Complaint fails to state a legally cognizable claim.  As such, Enhabits' defenses do not obviate this court's conclusion that there is probable cause that the Frontier plaintiffs will prevail on their breach of contract claim.

In addition, the court notes that the Enhabit defendants have raised a single Counterclaim, which asserts that, because "Enhabit is likely to prevail in the litigation", it should be awarded litigation costs and expenses.  See Answer at ¶¶ 19-23.  Because this Counterclaim pertains solely to the awarding of costs in the event the Enhabit defendants prevail, it does not alter this court's determination as to probable cause.[17]

In sum, because there is "a bona fide belief in the existence of the facts essential under the law" that the defendants' withholding of the $555,957.69, violated the Agreement, the court concludes that there is probable cause that the plaintiffs will prevail on their breach of contract claim.

E.     Attachment

Having determined that there is probable cause that the Frontier plaintiffs will succeed on their breach of contract claim, the court must now consider whether there is

---

[17] In addition to a finding of probable cause after "taking into account any defenses, counterclaims or set-offs," section 52-278d(a) requires a court to determine:

> (2) whether payment of any judgment may be rendered is adequately secured by insurance, (3) whether the property sought to be subjected to the prejudgment remedy is exempt from execution, and (4) if the court finds that the application for the prejudgment remedy should be granted, whether the plaintiff should be required to post a bond to secure the defendant against damages that may result from the prejudgment remedy or whether the defendant should be allowed to substitute a bond for the prejudgment remedy.

The court received no evidence of insurance, and no argument was made in the briefs or at the hearing regarding any exempt property.  In addition, the Enhabit defendants have not requested that the Frontier plaintiffs post a bond to secure them against damages that may result from the remedy; accordingly, the court declines, at this juncture, to order the plaintiffs to post a bond.

probable cause that a judgment will issue in the amount equal to, or greater than, the $325,000 sought by the plaintiffs.  Here, the amount requested by the plaintiffs encompasses, approximately, half the amount that the defendants withheld—the 50% that Frontier would have been permitted to retain under Section 16—plus prejudgment interest.[18]  The court finds this requested amount to be a reasonable and accurate assessment of the amount of damages that the Frontier plaintiffs will be awarded, should they prevail on their claim.  There is probable cause that plaintiffs will be awarded a judgment in an amount equal to, or greater than, the $325,000 sought.  Accordingly, the court grants the plaintiffs' application to attach $325,000 of the defendants' assets.

To ensure that the Enhabit defendants satisfy the prejudgment remedy, the Frontier plaintiffs have also moved for an order from this court compelling the defendants to disclose their assets.  See Plaintiffs' Motion to Disclose Property and Assets (Doc. No. 27).  "Generally, under Connecticut law, a disclosure of assets is ordered if a prejudgment remedy is ordered."  Wachovia, 2010 WL 466160, at *9 (citing Conn. Gen. Stat. § 52–278n).  Because of its probable cause determination, the court finds disclosure of assets to be appropriate.  The court therefore grants the plaintiffs' Motion for Disclosure and orders the defendants to disclose to plaintiffs, within thirty days of the date herein, the existence, location, and extent of any property sufficient to satisfy a total judgment in the amount of $325,000.  However, if, prior to the deadline for

---

[18] The Frontier plaintiffs have calculated a prejudgment interest rate of 7.75%, which is the average of the Delaware prejudgment interest rate over the relevant period.  See Pls.' Mot. at 3.  The Enhabit defendants do not contest the Frontier plaintiffs' assessment of the prejudgment interest.  Indeed, the court finds that the plaintiffs' calculation of the prejudgment interest is, for purposes of this Ruling, reasonable and accurate.

disclosure, the defendants satisfy the prejudgment remedy, <u>see</u> Conn. Gen. Stat. § 52–278n, disclosure will not be necessary, and the court's order granting the plaintiffs' Motion for Disclosure will be vacated.

## V.    CONCLUSIONS

For the reasons stated above, the Motion for Prejudgment Remedy (Doc. No. 27) is granted.  The court awards the Frontier plaintiffs a prejudgment remedy amounting to an attachment of $325,000 of the Enhabit defendants' assets.

The accompanying Motion for Disclosure (Doc. No. 27) is also granted.  The court orders defendants to disclose to plaintiffs, within thirty days, any property sufficient to satisfy a judgment in the amount of $325,000, unless the defendants satisfy the prejudgment remedy prior to the disclosure deadline.


**SO ORDERED.**

Dated at New Haven, Connecticut this 8th day of May 2024.


 /s/ Janet C. Hall
Janet C. Hall
United States District Judge